IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GREEN,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| Defendant. | : | **NO. 07-2177** |

**M E M O R A N D U M AND ORDER**

PRATTER, J.                                                                                                    MARCH 12, 2009

Before the Court is Defendant City of Philadelphia's Motion for Summary Judgment and Plaintiff Michael Green's Response. Mr. Green asserts a claim for racial discrimination and harassment under 42 U.S.C. § 1983. Because Mr. Green fails to establish the municipal liability necessary to successfully bring such a claim against the City, Defendant's Motion will be granted.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

Michael Green is an African American male who began working for the City's Fire Department in December, 1993; he is still employed by the City as a firefighter. About five years after he started working at the Fire Department, Mr. Green was arrested for rape and assault. The case was later dismissed. Mr. Green was fired because of the arrest, but reinstated with backpay pursuant to the union grievance process. While the charges were pending, Mr. Green discussed his situation with the Valiants, a group of mainly African American firefighters dedicated to promoting the interests of African Americans in the Department. Mr. Green later quit the group after his reinstatement because he was not satisfied with the Valiants' response.

Over the years, Mr. Green exhibited a pattern of emotional outbursts and unusual

---

[1] The facts recounted here are undisputed unless otherwise noted.

1

behavior at work. In 2002, for instance, Mr. Green went home during a shift after being ordered by a superior officer to remove an earring. In 2004, believing that Malcolm Clay, his former lieutenant, was making fun of him, Mr. Green punched him. As a result of this incident, Mr. Green was referred to a counseling service, the Employee Assistance Program ("EAP"), where he received anger management and self-discipline instruction.[2] Also in 2004, Mr. Green pounded a punching bag until he was sweating heavily after being instructed not to lower the American flag before it was time to do so. He also screamed at a fellow firefighter when he was supposed to be training her.

Mr. Green also exhibited a range of unusual behavior during his employment with the Fire Department, e.g, laughing until he cried at "foghorn, leghorn" cartoons, diverting water from the booster line to spray away bees.[3] He also shared with co-workers his own writings about serial killers and transvestites who engaged in sexual assault and genital mutilation. Mr. Green admits that he did author the writings and show them to coworkers, but points to the testimony of a supervisor noting that his writings did not interfere with his ability to perform his duties.

Mr. Green had a history of accidents while driving Fire Department vehicles; he was involved in at least 6 accidents, 5 of which were deemed preventable. The accidents occurred over a period of years between 2000 and 2006 and included hitting vehicles on the side of the road, hitting a pole, and clipping a mirror on a parked vehicle. Mr. Green was also involved in an unreported incident when he hit a mirror on a parked vehicle. According to the deposition

---

[2] The City says that although Mr. Green was sent to EAP, he was not formally disciplined for his actions. Mr. Green asserts that being sent to EAP and being put in charge of the reserve ladder were disciplinary actions taken against him as a result of the incident and agrees that there were no formal charges, but asserts that the incident and aftermath became part of his personnel file.

[3] Mr. Green explains that he sprayed the bees so that he could hook up a hose to the hydrant.

testimony of Lieutenant Clay, he temporarily took Mr. Green out of the driver rotation and spoke "harshly" to him after the incident, and that as a result, Mr. Green reported Lieutenant Clay's actions to the Department Employee Rights Officer. In April 2008, Mr. Green also was involved in an accident while driving a medic unit–the medic unit swiped the side of a SEPTA bus, causing damage to the medic unit's mirror.

In May 2006, Lieutenant Senski, one of Mr. Green's supervisors at that time, noticed that Mr. Green nearly hit several parked cars on the way back from a run. Lieutenant Senski spoke with Captain Neri about the incident, and the two decided to meet with Mr. Green to discuss his driving. During the meeting, Mr. Green initially laughed or smirked because he believed it was a "practical joke." When he realized that his supervisors were serious, he became extremely angry and stormed out of the meeting. Because he left the workplace without permission, Mr. Green's entire fire company was temporarily put out of service. As a result of the incident, Mr. Green was again sent to EAP, sent to remedial driving training, detailed away from his company (Engine 63), and taken off the driving rotation until notice came from EAP, the medical unit, or the academy that he was ready for return to the rotation.

Shortly thereafter, Mr. Green returned to Engine 63 and discovered that he had been taken off the driving rotation; the firefighters driving in his place were either African American or Hispanic. Lieutenant Senski was on vacation when Mr. Green initially returned to Engine 63; and when he came back from vacation on June 4, 2006, he asked Mr. Green why he was not driving. Mr. Green replied that Lieutenant Senski knew why. Whether Lieutenant Senski did know why Mr. Green was not driving is a matter of dispute–Mr. Green interprets the question as harassment, arguing that Lieutenant Senski knew quite well why Mr. Green was not driving.

Later on that same day, Mr. Green asked Lieutenant Senski for a transfer because others at the station were "out to get him" and he felt "unsafe." Lieutenant Senski called Chief Sullivan

and reported that Mr. Green felt unsafe and was isolating himself from the rest of the company; he also filled out a transfer order for Mr. Green.  As a result, Mr. Green was detailed out to another company for the remainder of his tour.[4]

Mr. Green was then officially transferred to Ladder 2, effective for his next tour.  Ladder 2 was selected as an appropriate transfer destination by Deputy Commissioner Hargett because he felt that Ladder 2 would provide Mr. Green with more structure, more interaction with colleagues, more training, and the opportunity to learn more skills and because there were vacancies at that station.  Mr. Green asserts that Deputy Commissioner Hargett transferred him to Ladder 2 because of a memorandum written by Chief Sullivan that was attached to the Request to Transfer form.  The memorandum discussed the circumstances surrounding Mr. Green's transfer request, as well as other performance-related issues.  Deputy Commissioner Hargett confirmed in his deposition that receiving such a memorandum was unusual because it did not "contain anything really positive" about Mr. Green.  See Hargett Dep. at 29, attached to Pl.'s Opp. at Ex. D.  Mr. Green had, however, requested two locations other than Ladder 2 as transfer possibilities, but these locations were deemed inappropriate because they lacked strong supervisors and were "slow" stations.  After Mr. Green was transferred, but before he started at Ladder 2, Chief Wilkins referred Mr. Green to EAP.

Mr. Green testified in his deposition that he did not believe that Deputy Commissioner Hargett, Captain Neri, Lieutenant Senski or Lieutenant Clay acted with anti-black animus.  In fact, he testified that he was sent to EAP and taken off the driving rotation not because of race, but because of his former arrest and because he punched Lieutenant Clay.  Mr. Green asserts in

---

[4] Firefighters in Philadelphia work in 4-day tours of duty, consisting of 2 days of 10 hours of day work and two days of 4 hours of night work.  Following a tour of duty, firefighters have 4 days off.

his Opposition to Defendant's Motion that Firefighter Boyle, a white male and a fire department rookie, hit a FedEx truck while driving and was not disciplined. Mr. Green admitted that he did not lose pay, work, or overtime because of the allegations in his complaint, nor did he seek any mental health treatment. He testified at deposition that the incidents alleged in his Amended Complaint impacted him by making him "a little bit more cautious" in his work relationships. See Green Dep. at 249, attached to Def.'s Mot. for Summ. J. at Ex. B.

Mr. Green admitted at his deposition that an African American firefighter, Clay Finley, got into an accident at Engine 63 and was not disciplined, while a white firefighter, Ralph O'Neill was transferred to another station after an incident between him and his lieutenant.

Mr. Green filed a complaint May 30, 2007, asserting a claim of racial discrimination and harassment under 42 U.S.C. § 1981 and seeking damages for backpay, front pay, interest, fringe benefits, and past and future mental anguish and emotional distress, as well as punitive damages. The City filed a motion to dismiss, which was granted with prejudice with regard to Mr. Green's punitive damages claim, as well as with regard to any conduct occurring before May 25, 2005, and without prejudice as to the remainder of his claim because his claims should have been asserted under 42 U.S.C. § 1983 rather than § 1981. On November 27, 2007, Mr. Green filed a one-count amended complaint seeking the same damages under 42 U.S.C. § 1983.

On January 12, 2009, after completion of discovery, the City filed the instant motion for summary judgment.

**LEGAL STANDARD**

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted only if

5

the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law.  Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

### DISCUSSION

As an initial matter, Mr. Green's complaint alleges only one cause of action–a single count under 42 U.S.C. § 1983.  In that count, however, he mentions both racial discrimination and harassment.  The City construes the claim as one for "hostile work environment," but notes

6

that in the event that the claim also includes employment discrimination, the claim still fails.  In his opposition to the City's motion, Mr. Green argues under both theories.

Regardless of which theory Mr. Green intended to pursue, he sued only the City, so he must establish municipal liability under § 1983 to prevail.  In Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), "the Supreme Court held that § 1983 may give rise to municipal liability when a constitutional violation occurs as a result of a policy, regulation, or decision officially adopted by the municipality or informally adopted by custom."  Benckini v. Coopersburg Police Department, 2004 U.S. Dist. LEXIS 14663, at *18 (E.D. Pa. July 27, 2004) (citing Monell).  However, municipalities cannot be held vicariously liable pursuant to 42 U.S.C. § 1983 because under this statute there is no respondeat superior liability for the actions of municipal agents.  Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006) (citing Monell v. Dept. of Soc. Serv., 436 U.S. 658, 691 (1978)).  "[A] municipality may be held liable only if its policy or custom is the 'moving force' behind a constitutional violation."  Id.  Thus, it is not enough to show that a constitutional violation has occurred.  To establish liability, the plaintiff must prove that the violation was the result of a municipal policy or custom.  Id.

The existence of a policy or custom can be established by one of two ways, namely, (1) by showing that a "'decisionmaker possessing final authority to establish municipal policy with respect to the action' issued an official statement of policy," Jiminez v. All American Rathskeller, 503 F.3d 247, 250 (3d Cir. 2007) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)), or (2) by demonstrating that a "custom" exists "when, though not authorized by law, the 'practices of state officials [are] so permanent and well settled' that they operate as law."  Id. (quoting Monell, 436 U.S. at 690).

The City argues that mid-level supervisors such as Captain Neri, Lieutenant Senski,

Lieutenant Clay, and Chief Sullivan,[5] the individuals that Mr. Green claims disciplined him for discriminatory reasons, do not qualify as policymakers for Section 1983 purposes. As support, it cites Andrews v. City of Philadelphia, 895 F.2d 1469, 1480-82 (3d Cir. 1990) (police personnel in the rank of Captain and Personnel Director were not even considered as potential policymakers); and Martin v. City of Philadelphia, No. 98-CV-5765, 2000 WL 11831, at * 9 (E.D. Pa. Jan. 7, 2000) (granting summary judgment to the city because plaintiff failed to prove the existence of a policy). In Martin, the plaintiff asserted that a police captain and a police lieutenant were policymakers for Monell purposes and identified the policy in question as "apathy and buckpassing." Id. The court noted that "[i]t is the plaintiff's burden to show the existence of a policy," and that a policy for Monell purposes is made "'when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict.'" Id. (quoting Andrews, 895 F.2d at 1480). The court held that the plaintiff's summary conclusion that a police captain and lieutenant were policymakers was insufficient to establish municipal liability. Id.

Here, Mr. Green argues that municipal liability may arise from a single act of a policymaker, and acknowledges that a policymaker is a person who is in an authoritative policy-making position and whose act represents the official policy of the municipality. Not only does Mr. Green in no way counter the case law from the Third Circuit cited by the City (in fact, he states that "Defendant has correctly stated the general legal principles that govern municipal liability under 42 U.S.C. § 1981 [sic]"), but the only case he does cite in his support is an Eighth Circuit Court of Appeals case, Springdale Educ. Assoc. v. Springdale Sch. Dist., 133 F.3d 649, 652 (8th Cir. 1998), a case that is not even on point. In Springdale, the court, while noting that

---

[5] In his response, Mr. Green adds Chief Wright to the list. However, nowhere in the Defendant's statement of undisputed facts or in Plaintiff's response thereto is Chief Wright mentioned, nor does that name appear in Mr. Green's Amended Complaint.

municipal liability may arise from a single act of a policymaker when the act represents the official policy of the municipality, affirmed that the individual that the plaintiffs argued was a policymaker, a school superintendent, was not an authorized policymaker because his decisions were constrained by policies not of his making. Id. at 652. Moreover, the plaintiffs there were alleging much more than a single act in support of their claim. See id. at 650-51.

In support of his argument for Monell liability, Mr. Green merely states that "under the circumstances, the actions of Capt. Neri, Chief Sullivan and Chief Wright in ordering Mr. Green to EAP constitute singular acts of policymakers that are sufficient to impose liability on Defendant." Pl.'s Opp. at 10. This conclusory statement comes nowhere close to establishing that any of the alleged offenders were policymakers or that their actions represented the official policy of the City. He cites no evidence to demonstrate that any of the individuals he listed had the authority to set policy or were unconstrained by the official policy of the Philadelphia Fire Department.

The City also argues convincingly that Mr. Green has not demonstrated the existence of a "custom" by showing that "though not authorized by law, the 'practices of state officials [are] so permanent and well settled' that they operate as law." See Jiminez, 503 F.3d at 250 (quoting Monell, 436 U.S. at 690). It contends that Mr. Green has shown no more than a series of isolated incidents involving disciplinary actions against him, which, even if proven to be discriminatory (which the City denies), are not enough to rise to the level of a custom of treating black firefighters more harshly than white firefighters. Mr. Green does not even address this argument in his response.

Thus, Mr. Green has failed to establish that the City is liable for an alleged violation of

Section 1983, under any theory.[6]

**CONCLUSION**

For the foregoing reasons, the City's Motion for Summary Judgment is granted, and Mr. Green's claims are dismissed in their entirety.

---

[6] Even if Mr. Green had established municipal liability, his claim would still fail under either an employment discrimination theory or hostile work environment theory. Mr. Green can not make out a prima facie case of employment discrimination because he has not shown that similarly situated non-protected persons were treated more favorably. See Dill v. Runyon, Civil Action No. 96-3584, 1997 WL 164275, at *3-4 (E.D. Pa. Apr. 3, 1997) (holding that the plaintiff had failed to prove this prong of the prima facie case when none of the individuals that the plaintiff cited as comparators were similarly situated to the plaintiff). Here, the only individual Mr. Green argues in his opposition who is "similarly situated" is a white firefighter, Mr. Boyle, who was not disciplined after clipping a FedEx truck. Contrary to Mr. Green's argument, however, Mr. Boyle was not similarly situated to Mr. Green; he was a rookie firefighter with little experience and no prior record of traffic accidents, while Mr. Green had years of experience in the Department and a long record of driving accidents.

As to a "hostile work environment" claim, Mr. Green has not shown any link between the alleged "hostile" actions of fellow employees and supervisors and his race. See Pollock v. City of Philadelphia, Civil Action No. 06-4089, 2008 WL 3457043, at *8 (E.D. Pa. Aug. 8, 2008) (stating that a plaintiff must show, among other elements, that he or she "suffered intentional discrimination because of race" to make out a race-based hostile work environment claim) (citing Andrews, 895 F.2d at 1482. As previously noted, he has produced no evidence that similarly situated white firefighters were treated differently from him. Moreover, Mr. Green himself admitted at his deposition that the discrimination of which he complains, "is not about race." See Green Dep. at 221, attached to Def.'s Mot. for Summ. J. at Ex. B; see also id. at 225-26 ("You know, it's not about, you know, even though it's white, black, I'm not looking at it like that . . . This is discrimination 'cause of the fact that somebody does something prior that has no bearing on the department."). Nor has he demonstrated that the alleged harassment was "severe or pervasive." See Pollock, 2008 WL 3457043, at *8.

10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GREEN,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| Defendant. | : | NO. 07-2177 |

**O R D E R**

**AND NOW**, this 12th day of March, 2009, upon consideration of Defendant City of Philadelphia's Motion for Summary Judgment (Docket No. 23) and Plaintiff Michael Green's Response in Opposition thereto (Docket No. 30), **IT IS HEREBY ORDERED** that Defendant's Motion (Docket No. 23) is **GRANTED**. Plaintiff's claim under 42 U.S.C. § 1983 is **DISMISSED**.

The Clerk shall mark this case **CLOSED** for all purposes, including statistics.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

11